## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

BENJAMIN ALEXANDER,
GEORGE COLLIER by his next
friend, Timothy Collier, RAIMUNDO
LEAL, JEFFERSON LANGLAISE,
CELIA LOPEZ by her next friend,
Javier Lopez, and GERALDINE
DAVENPORT by her next friend,
Barbara Roti, on behalf of themselves
and all others similarly situated,

      Plaintiffs,

vs.                                Case No.

JUSTIN SENIOR, in his official
capacity as Secretary, Florida Agency
for Health Care Administration, and
JEFFREY BRAGG, in his official
capacity as Secretary, Florida
Department of Elder Affairs,

      Defendants.
_____/

## CLASS ACTION COMPLAINT
## FOR DECLARATORY AND INJUNCTIVE RELIEF

### PRELIMINARY STATEMENT

1.    This is a statewide class action lawsuit brought by low-income older

adults and adults with disabilities on a waitlist for long term care services.  They

1

bring this suit because they seek, but cannot obtain, long-term care services in their homes or in other community-based settings. Defendants have the ability, under federal Medicaid law, to provide these services. Instead, they ration services to a restricted number of people, and, as a result, fail to address the care needs of thousands of waitlisted older adults and adults with disabilities. Defendants' administration of the Medicaid long-term care system violates the civil rights of the Named Plaintiffs and proposed class by requiring them to choose between receiving needed care and remaining in their homes.

2.     Specifically, Defendants' administrative, planning, and funding decisions heavily favor nursing facility payment and nursing facility entry, while allowing the waitlist for Medicaid home and community based long-term care services to grow to be the longest in the nation. Meanwhile, Florida ranks near the bottom in the nation in terms of Medicaid funding of home and community based services as compared to nursing facility expenditures. Defendants utterly fail to meet the demonstrated need for home and community based long-term care services.

3.     Florida's Statewide Medicaid Managed Care Long-Term Care Program includes both nursing facility care and home and community based care services in a managed care system. Plaintiffs have sought care and treatment through

2

the part of the program that would allow them to remain in their most integrated setting, termed herein as the "Long-Term Care Waiver." Yet, because of the discriminatory way Defendants manage the public health care system, Named Plaintiffs and others like them face the real prospect of unnecessary institutionalization.

4.    Defendants' failure to provide needed home and community based services to the Named Plaintiffs and proposed class violates the Americans with Disabilities Act (ADA), 42 U.S.C. § 12132.

## JURISDICTION

5.    This is an action for declaratory and injunctive relief under the ADA, 42 U.S.C. § 12132.

6.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 & 1342.  Plaintiffs' claims for declaratory and injunctive relief are authorized under 28 U.S.C. §§ 2201-02.

## VENUE

7.    Venue lies in the Northern District pursuant to 28 U.S.C. § 1391(b), and in the Tallahassee Division, because Defendants officially reside there.  N.D. Fla. Loc. R. 3.1.

3

<u>NAMED PLAINTIFFS</u>

8.   BENJAMIN ALEXANDER is 55-years-old.  He lives with his elderly mother in Duval County, Florida.  He is a person with a disability under the ADA.  He is eligible for the Long-Term Care Waiver.  He wishes to remain living in the community with appropriate home and community based services.  Mr. Alexander sought services through the Long-Term Care Waiver and was placed on the waiting list in March 2018.

9.   GEORGE COLLIER is 91-years-old. Pursuant to Fed. R. Civ. P 17(c)(2), he sues through his next friend, Timothy Collier.  He lives in an assisted living home in St. Lucie County, Florida.  He is a person with a disability under the ADA.  He is eligible for the Long-Term Care Waiver.  He wishes to remain living in the community with appropriate home and community based services.  Mr. Collier sought services through the Long-Term Care Waiver and was placed on the waitlist in 2015.

10.   RAIMUNDO LEAL is 76-years-old.  He lives in his own apartment in Hillsborough County, Florida.  He is a person with a disability under the ADA. He is eligible for the Long-Term Care Waiver.  He wishes to remain living in the community with appropriate home and community based services.  Mr. Leal sought services through the Long-Term Care Waiver and was placed on the

4

waitlist in 2016.

11.   JEFFERSON LANGLAISE is 50-years-old.  He lives in an assisted living home in Miami-Dade County, Florida.  He is a person with a disability under the ADA.  He is eligible for the Long-Term Care Waiver.  He wishes to remain living in the community with appropriate home and community based services.  Mr. Langlaise sought services through the Long-Term Care Waiver in 2017 and was placed on the waitlist in 2018.

12.   CELIA LOPEZ is 82-years-old.  Pursuant to Fed. R. Civ. P 17(c)(2), she sues through her next friend, Javier Lopez.  She lives in Miami-Dade County, Florida with her granddaughter, her granddaughter's husband and three great-grandchildren.  She is a person with a disability under the ADA.  She is eligible for the Long-Term Care Waiver.  She wishes to remain living in the community with appropriate home and community based services.  Ms. Lopez sought services through the Long-Term Care Waiver and was placed on the waitlist in November 2014.

13.   GERARLDINE DAVENPORT is 90-years-old.  Pursuant to Fed. R. Civ. P 17(c)(2), she sues through her next friend, Barbara Roti.  She lives in an assisted living home in St. Lucie County, Florida.  She is a person with a disability under the ADA.  She is eligible for the Long-Term Care Waiver.  She

wishes to remain living in the community with appropriate home and community based services.  Ms. Davenport sought services through the Long-Term Care Waiver and was placed on the waitlist in 2013.

<u>DEFENDANTS</u>

14.  Defendant JUSTIN SENIOR is Secretary of Florida's Agency for Health Care Administration (AHCA) and is sued in his official capacity.  (This Defendant will be referenced by the agency, AHCA.)  AHCA is the "single state agency" that operates and administers Florida's Medicaid program, including Florida's Long-Term Care Waiver, and is charged with developing legislative budgetary requests for the Medicaid program.  S*ee* 42 U.S.C. § 1396a(a)(5), § 20.42(3), Fla. Stat. (2018), § 216.023, Fla. Stat. (2018).  Secretary Senior is responsible for the oversight, supervision, and control of AHCA and its divisions, and is ultimately responsible for ensuring that AHCA's services for people with disabilities are provided in conformance with federal law.

15.  Defendant JEFFREY BRAGG is Secretary of Florida's Department of Elder Affairs (DOEA), and is sued in his official capacity.  (This Defendant will be referenced by the agency, DOEA.)  DOEA is the primary state agency responsible for administering human services programs for the elderly and developing policy recommendations for long-term care.  § 430.03, Fla. Stat.

6

(2018).  It recommends legislative budget requests for programs and services for the state's elderly population.  *Id*.  Among other duties, DOEA prepares, submits to the Governor and the Legislature, and monitors implementation of a master plan for policies and programs in Florida that relate to aging.  *Id.* § 430.04.  DOEA funds a community care service system, the declared primary purpose of which is "the prevention of unnecessary institutionalization of functionally impaired elderly persons through the provision of community-based core services."  *Id.* § 430.204.  DOEA is also the agency responsible for maintaining the statewide waitlist for the Long-Term Care Waiver, including assessing each applicant's priority status on that waitlist and making offers of enrollment to eligible individuals.  *Id.* § 409.979.

16.  At all times relevant to this Complaint, Defendants were public entities under the ADA.  42 U.S.C. § 12132.

<u>CLASS ACTION ALLEGATIONS</u>

17.  Pursuant to Fed. R. Civ. P. 23(a) and (b)(2), the Named Plaintiffs bring this action on behalf of themselves and all other persons similarly situated.

18.  The proposed class consists of:

> Adult residents of Florida who are at risk of unnecessary institutionalization without home and community based long-term care services because they:  (1) are residing, and wish to

7

remain, at home or in a community residential setting; (2) qualify or would qualify if allowed to enroll in the Long-Term Care Waiver; and (3) have been placed on the Long-Term Care Waiver waitlist.

19. <u>Numerosity</u>:  The proposed class is so numerous that joinder of all its members is impracticable.  According to the Florida Department of Elder Affairs, as of August 2018, there were more than 50,000 people on a waitlist for home and community based services through the Long-Term Care Waiver.

20. <u>Commonality</u>:  The questions of law or fact that are common to the Named Plaintiffs and proposed class members include:

a.   Whether Defendants' failure to provide needed home and community based services to the Named Plaintiffs and proposed class members violates the ADA.

b.   Whether the Named Plaintiffs and proposed class members can access appropriate long-term care services outside of entry to a nursing facility.

c.   Whether Defendants' Medicaid funded long-term care system favors institutional services to the detriment of the Named Plaintiffs and proposed class members seeking home and community based services.

21. <u>Typicality</u>:  The claims of the Named Plaintiffs are typical of the claims of the class as a whole in that the Named Plaintiffs and proposed class members

8

are all qualified individuals with disabilities who wish to remain in the community, but who are without Medicaid long-term care services and are at risk of unnecessary institutionalization.

22. Adequate representation:  The Named Plaintiffs will fairly represent and adequately protect the interests of the proposed class as a whole.  The Named Plaintiffs do not have any interests antagonistic to those of other proposed class members.  By filing this action, the Named Plaintiffs have displayed an interest in vindicating their rights, as well as the claims of others who are similarly situated.  The relief sought by the Named Plaintiffs will inure to the benefit of members of the proposed class generally.  The Named Plaintiffs are represented by counsel who are skilled and knowledgeable about civil rights litigation, disability discrimination, Medicaid law, practice and procedure in the federal courts, and the prosecution and management of class action litigation.

23. Defendants have acted or refused to act on grounds generally applicable to the proposed class, thereby making final injunctive relief appropriate with respect to the proposed class as a whole under Fed. R. Civ. P. 23(b)(2). Although the specific disabilities of the proposed class members can vary, they share a common need for Medicaid funded home and community based services.  A class action is superior to individual lawsuits for resolving this

controversy.

## FACTUAL ALLEGATIONS

*Statewide Medicaid Managed Care Long-Term Care Program*

24.  Medicaid is a joint federal and state program that covers medical services to low-income persons pursuant to Title XIX of the Social Security Act, 42 U.S.C. §§ 1396-1396v.

25.  States are not required to participate in Medicaid, but if they do, they must comply with the requirements of Title XIX and its implementing regulations promulgated by the U.S. Department of Health & Human Services. States which participate must submit to the federal government a state Medicaid plan that fulfills the requirements of Title XIX.  42 U.S.C. § 1396a(a).

26.  One of the primary purposes of Medicaid is "to furnish … rehabilitation and other services to help such families and individuals attain or retain capability for independence or self-care …."  42 U.S.C. § 1396-1.  Each participating state's Medicaid plan must contain reasonable standards to determine the extent of services needed to obtain these objectives.  42 U.S.C. § 1396a(a)(17).

27.  Coverage of certain services is mandatory under Title XIX, including

nursing facility services.   42 U.S.C. § 1396a(a)(10)(A)(i) (incorporating 42 U.S.C. § 1396d(a)(1)-(5), (17), (21)).

28.  Federal Medicaid law allows states to include certain home and community based services in their state Medicaid program plans, including personal care services.  Such services are provided to all qualifying persons, without enrollment limits.  42 U.S.C. § 1396d(a)(xvii)(24).  Florida has opted not to provide these services to older adults or adults with disabilities.

29.   In addition, Federal Medicaid law allows states to offer home and community based waiver programs (Waiver Programs).   These Waiver Programs are designed to enable people who are elderly or have disabilities, and otherwise need the level of care provided in a nursing facility or other institution, to receive long-term care services in the community.  42 U.S.C. § 1396n(c).  The federal Medicaid program allows states to obtain waivers of certain program requirements, including the requirement that otherwise prohibits enrollment caps.  42 U.S.C. § 1396n(c)(3).

30.   The purpose of waivers, like Florida's Long-Term Care Waiver, is to provide "an array of home and community-based services that an individual needs to avoid institutionalization."  42 C.F.R. § 441.300.

31.  When providing long-term care services, State Medicaid programs

must comply with the ADA. The ADA prohibits unnecessary institutionalization or segregation of persons with disabilities. 42 U.S.C. § 12132. A state's obligations under the ADA are distinct from its obligations under the Medicaid Act.

32. Florida's Medicaid program provides only a few options for adults who are disabled or elderly and need long-term care services: nursing facility placement, or home and community based services under the Long-Term Care Waiver. In addition, six counties operate limited facility based long-term care day services under the Program of All-Inclusive Care for the Elderly.

33. Nursing facilities are institutional settings under the ADA.

34. On average, the cost of nursing facility placement is several times the cost of care provided in the home and community through the Long-Term Care Waiver.

35. The Long-Term Care Waiver provides home and community based services in various residential settings, including assisted living homes, adult family care homes, and in an individual's own home or family member's home.

36. The Long-Term Care Waiver covers a wide range of services critical to maintaining people with long-term care needs in their homes and in the community. These services include assisted living care, adult day health care,

assistive care services, attendant nursing care, behavioral management, care coordination, home accessibility adaptation, home delivery of meals, homemaker services, hospice, nursing, medical equipment and supplies, medication administration and management, personal care services, personal emergency response system, respite, skilled therapies and non-emergency transportation.

37.  In December 2017, the federal Centers for Medicare & Medicaid Services (CMS) approved Defendant ACHA's application for the current Long-Term Care Waiver program, authorizing it to continue for another five years.

38.  In the waiver application, Defendant AHCA requested to limit the number of people getting services to 62,000 at any point in time, with no increase in capacity over the five years of the approval period.

39.  States can obtain CMS approval to raise a waiver program's enrollment cap to respond to increased demand. Some states do not cap enrollment in their long-term care waiver program at all.

40.  As of October 2018, there were 59,329 persons receiving home and community based services through the Long-Term Care Waiver.

41.  The Long-Term Care Waiver has absorbed seven other waiver programs that had been targeted to meet the needs of discrete populations.  The

most recent consolidation in 2018 decommissioned three waiver programs dedicated to meeting the needs of people with HIV, traumatic brain or spinal cord injuries, and Cystic Fibrosis — a total of 7,500 slots. Of this number, a little over 1,700 people previously served were transitioned onto the Long-Term Care Waiver.

42.   The transition of people from the decommissioned waivers to the Long-Term Care Waiver has increased the number of people served on the Long-Term Care Waiver but has reduced the capacity of the system as a whole. People newly seeking services that had been covered by the decommissioned waivers now must join the lengthy waitlist for the Long-Term Care Waiver.

43.   As of October 2018, there were 53,193 persons on Defendants' waitlist for the Long-Term Care Waiver.

44.   The Long-Term Care Waiver is considered an Aged and Disabled waiver by CMS. According to Kaiser Family Foundation data, 31 states had no waiting list at all for their Aged, Physically Disabled or Aged and Disabled waivers (per 2016 data).

45.   The federal Medicaid Act does not allow waitlists for nursing facility services.

46.   Nursing facility occupancy rates in Florida are among the highest in the

14

country.

*Defendants' Waitlist Ranking Underestimates the Risk
of Unnecessary Nursing Facility Placement*

47.   When Named Plaintiffs and proposed class members seek to enroll in the Long-Term Care Waiver, they go through Defendants' assessment process to purportedly determine their level of risk of nursing facility placement.

48.   Defendant DOEA contracts with the regional Aging and Disability Resource Centers (ADRCs) to field requests and complete an assessment over the telephone.

49.   Once assessed, individuals are placed on the waitlist for Long-Term Care Waiver services, called the Assessed Prioritized Consumer List. Completion of the assessment results in each individual being placed by numerical rank into one of five "priority levels" (levels 1-5): the higher the level, the higher the assessed risk. Fla. Admin. Code R. 59G-4.193(3).

50.   There are additional levels of risk (levels 6-8) that DOEA ranks based on specific statutory characteristics. In October 2018, there were only 45 people on the Long-Term Care Waiver waitlist in levels 6-8.

51.   In addition, individuals in three statutory categories are authorized to apply directly for the Long-Term Care Waiver, without any additional

assessment of risk:  individuals residing in a nursing facility for at least 60 days who have requested to transition to their communities; children aged 18, 19 or 20 with medically complex care needs; and persons classified by Adult Protective Services as "high risk" and placed by the State in an assisted living facility.  § 409.979 (3)(f), Fla. Stat. (2018).

52.  Other than these three special statutory categories, Defendants' assessment of risk governs when a person may move off of the waitlist.

53.  Levels 0-5 are based exclusively on the results of an assessment conducted over the telephone.  This assessment process asks applicants a series of questions from the 701S assessment tool.  Responses to certain questions are then run through an algorithm, which determines the individual's "score" and priority level.  Fla. Admin. Code R. 59G-4.193(3).

54.  Certain important risk factors are not considered when assigning a priority level.  These include:  whether the survey was completed by someone else (*i.e.*, a proxy), memory loss, cognitive decline or dementia, the presence of Parkinson's Disease, full paralysis, previous nursing facility stay, the age of the caregiver, financial strain on the caregiver, and history of falls.  While some of these factors are captured in the assessment, the algorithm does not consider them in assigning a risk score.

55.   The assessment process relies heavily on voluntary caregiver involvement but does not properly take into account a caregiver's availability, ability, and willingness to provide support.

56.   The vast majority of people on the waitlist are over 60-years-old, and more than half of them are over 74-years-old.   A quarter of the waitlist is comprised of people 85 or older.

57.   Many people with dementia are on the wait list and are in need of services.   42% of people at Level 3 have dementia or a cognitive impairment; at Level 4 that number rises to 51%, and at Level 5 it is 57%.   But the assessment process does not adequately factor in dementia or cognitive impairment.   The assessment asks about medical validation of cognitive decline, but those questions have no impact on the individual's score or priority ranking on the waitlist.

58.   One in four caregivers of individuals at Level 3 priority have been found by Defendant DOEA to be "in crisis," and at Level 4 that number rises to more than half.   Nonetheless, people assessed at these levels wait years on average to get needed long-term care.

59.   Defendants' criteria and methods of administration perpetuate the institutionalization and segregation of people with disabilities by

17

underestimating their risk of institutionalization and failing to administer the long-term care system based on accurate assessments of need for long-term care services in the community.

*Defendants Do Not Move People Off of the Long-Term Care*
*Waiver Waitlist at a Reasonable Pace*

60.   Average wait times are long.  People with a Level 1 assessment wait on average 42 months.  Other average wait times are 43 months for Level 2, 40 months for Level 3, and 30 months for Level 4.

61.   Only people at the highest level of assessed risk, Level 5, move off of the waitlist within 3 months.  To achieve a Level 5 score, the person must demonstrate a high level of need for long-term care, have highly inadequate unpaid support, and have a caregiver in crisis.

62.   Between July 1, 2016, and March 8, 2018, over 1,400 people on the waitlist had to move to nursing facilities.  In this same period, over 8,600 people died while on the waitlist.

63.   The Long-Term Care Waiver waitlist continues to grow.  In March 2017, the waitlist had 42,195 people on it.  As of October 2018, there were over 53,000 people on the waitlist – an increase of over 20%.

64.   As the waitlist increases, the number of people at risk of unnecessary

institutionalization grows as well.

65.  Florida has no comprehensive, effectively working plan (called an "*Olmstead* Plan") for providing long-term care to proposed class members so they can remain in the most integrated setting in the community, rather than being forced into segregated, institutional settings by virtue of their care needs.

*Defendants Overly Rely on Nursing Facility Settings*

66.  The ADA requires that states administer their "services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d).  This requirement applies to state Medicaid programs.

67.  Despite their obligations to provide individuals with disabilities services in the most integrated setting appropriate to their needs, Defendants have allocated the vast majority of Florida's Medicaid long-term care resources to nursing facility services.

68.  Florida ranks near the bottom in the nation in terms of Medicaid expenditures for home and community based services for older adults and adults with disabilities.  Only 22.5% of Medicaid expenditures for long-term care for this population were for home and community based care in 2016.  This was less than half the national average of 45.2%.

69.  In 2016, Defendant AHCA's Medicaid program spent four times as much on nursing facility care as it did on home and community based long-term care for this population.

70.  In addition, Florida has become further entrenched in its commitment to institutions by lifting the moratorium for new certificates of need to allow for the building of new nursing facility beds.  Defendant AHCA has approved thousands of new nursing facility beds since the moratorium was lifted in 2015.

71.  Defendant AHCA has an incentive program within the long-term care system that provides fiscal rewards to managed care entities who transition people out of nursing facilities and into the Long-Term Care Waiver.  There is no similar incentive program to bring people into the Long-Term Care Waiver from the waitlist.  The result is an incentive to move into a nursing facility: a person seeking services at home or in the community can bypass the long waitlist only by first submitting to at least 60 consecutive days of institutionalization in a nursing facility.

72.  Transitioning out of a nursing facility placement is difficult for low-income people.  Once Medicaid-eligible individuals are admitted to nursing facilities, they must turn over most of their income, including Social Security benefits, to the state and nursing facility, except for a small monthly personal

needs allowance.

73.   As a result, nursing facility residents are often unable to continue paying rent or mortgages and accordingly may lose the home they had before entering the nursing facility.

74.   Defendants administer their Medicaid long-term care system in a discriminatory manner that perpetuates the institutionalization and segregation of persons with disabilities, over relies on nursing facility services and underfunding community based care, and fails to provide sufficient alternative Medicaid funded long-term care services in the community.

## NAMED PLAINTIFFS' ALLEGATIONS

### *Benjamin Alexander*

75.   Mr. Alexander is a Medicaid beneficiary who requested Long-Term Care Waiver services in early 2018, but was placed on the waitlist.

76.   Mr. Alexander became disabled as a result of back surgery he had three years ago that left him paralyzed.  At first quadriplegic, Mr. Alexander was able to regain most movement in his upper body.  However, his left hand does not open completely.   He is paralyzed from the waist down, has uncontrolled muscle spasms, abdominal pain, severe constipation, and is incontinent.

77.   Mr. Alexander has been treated in a hospital approximately ten times

in the past year due to his ongoing muscle spasms, abdominal pain, and constipation.

78.   Mr. Alexander lives with his 92-year-old mother in her home and relies on her and a former neighbor to help him.  He cannot bathe, maintain hygiene, or perform incontinence care without assistance.  He cannot keep his home clean and safe without help.  Neither Mr. Alexander nor his mother are licensed to drive and they must rely on others to help with shopping.  They also rely on the Meal on Wheels program, which comes once per day.

79.   Mr. Alexander's mother is elderly with her own physical health problems including unsteadiness.  She has great difficulty meeting her son's physical care needs.  When his legs seize up on him, she cannot assist him in getting dressed or attend to his incontinence.  When he needs to move to his wheelchair, she struggles to lift him and help him transfer.  She is not confident she has the ability to provide the care he needs.

80.   The home Mr. Alexander lives in is not accessible to him.  There is no shower that he can maneuver into and his mother cannot lift him into the tub, so she gives him a sponge bath in his chair or on his bed.  Mr. Alexander rotates himself every two hours with great difficulty because he does not have a bed or mattress that will adjust and assist with the prevention of skin breakdown.

81. Defendants recently assessed Mr. Alexander and ranked him at Level 3 on the waitlist.

82. Defendants' ranking failed to take into account his elderly mother's difficulty in lifting and maneuvering him to provide personal care.  When his mother is unable to provide care, he must rely on the kindness of a former neighbor who travels to his home to provide the care for him.  His ranking also did not weigh the financial strain on his caregiver, his numerous emergency room visits in the last year, or the total number of activities of daily living where he needs assistance.

83. Mr. Alexander wants to remain living with his mother, but he is at risk of unnecessary nursing facility entry.  He cannot independently care for himself and his 92-year-old mother cannot do so either, which leaves Mr. Alexander further dependent upon the uncertainty of his former neighbor's willingness to assist with his care needs.  Without his mother and his former neighbor's help, he would have to enter a nursing facility.

*George Collier*

86. Mr. Collier requested Long-Term Care Waiver services in 2015, but was placed on the waitlist.  He currently lives in an assisted living home.

87. Mr. Collier has numerous health conditions including dementia,

diabetes, and blindness. He cannot take medications by himself, and his diabetes has been uncontrolled at times. He was found unresponsive on the floor in the last year. He cannot use the telephone, shop and prepare meals, manage money or his medications, or go out into the community without assistance. He uses a walker to ambulate.

88. Mr. Collier is happy in his assisted living home, where he sings karaoke and enjoys dancing. He likes to go to the grocery store to buy his food, but needs total assistance. His daughter-in-law says that putting him in a nursing facility, "would be like putting him in a coffin."

89. Mr. Collier's assisted living home helps him with medication management and meal preparation including preparing his plate and cutting his food due to Mr. Collier's blindness. He also needs but is not receiving stand-by assistance with showering due to his unsteadiness, and assistance with dressing.

90. He is frequently dizzy and has had numerous falls in the last year, six of them requiring ambulance services. Most recently, Mr. Collier went to the emergency room for dementia and undiagnosed weakness.

91. Mr. Collier has unmet care needs because he does not have the money to cover the cost of needed services. These unmet needs place him at increased

risk of falls and wounds or infections.  For example, his unsteadiness in the shower leaves him at risk of more falls and hospitalizations.  He needs close monitoring of his blood glucoses to prevent further dizziness and falls.

92.   Defendants assessed and ranked Mr. Collier at Level 3 on the waitlist.

93.   The Defendants' ranking does not take into consideration the financial strain on Mr. Collier's son.  Though he continues to strive to pay the difference for Mr. Collier's assisted living facility, he also continues to pay additional health care costs for Mr. Collier such as dental care when Mr. Collier broke a tooth due to one of his falls.  In addition, his ranking did not take into account his dementia or his history of falls.

94.   Mr. Collier is at risk of unnecessary nursing facility entry.  Mr. Collier wants to remain in his home, so his son has been paying the difference between Mr. Collier's limited income and the cost of care and rent.  His son cannot sustain the $1,900 cost per month.  Without the services provided at his assisted living home, Mr. Collier would have to enter a nursing facility.

*Raimundo Leal*

95.   Raimundo Leal requested Long-Term Care Waiver Services in 2011 but was placed on the waitlist.

96.   Mr. Leal resides in a subsidized apartment and relies on occasional

assistance from neighbors or self-paid care for homemaking and other chores. If his apartment is not maintained, he risks being in violation of his lease and evicted.

97.    Mr. Leal is engaged with his family and community.  His brother comes to visit him each week, and his son and grandchildren provide companionship and help him to go to the grocery store.

98.    Mr. Leal has insulin-dependent diabetes, chronic obstructive pulmonary disease, and is subject to falls.  He also has rheumatoid arthritis.  His memory is sometimes poor.

99.    Mr. Leal cannot bathe and dress himself without assistance, and sometimes he cannot ambulate without help.  He has difficulty managing his medications.

100.   Mr. Leal has had several hospitalizations due to falls and has recently progressed from just using oxygen to now having a tracheostomy.

101.   Mr. Leal first requested Long-Term Care Waiver services in July 2011, where Defendants ranked him at Level 3.  He was placed on the wait list.

102.   Since his initial request, Mr. Leal has been assessed numerous times. In June 2017, Mr. Leal's health deteriorated and he requested a reassessment. Defendants ranked him at Level 4.  The assessment noted that he is a frequent

fall risk.  He needs daily help, but he rarely has assistance.  Different friends from his community will pitch in or help when they can.  He remained on the waitlist.

103.  In October of 2017, Mr. Leal needed more help at home and was reassessed again.  Defendants ranked him at Level 3, although he still was a fall risk and needed assistance.  He remained on the waitlist.  Mr. Leal was last reassessed in May of 2018 and is now ranked Level 2.

104.  Mr. Leal falls frequently, often due to respiratory distress and resulting in multiple hospitalizations.  He usually does not recall the events leading up to his falls and, without regular assistance in his home, has been lucky to have been found by neighbors or family.  Mr. Leal was recently hospitalized again in August 2018, and required a tracheostomy to address oxygen deficiency.  He was later admitted to a subacute care hospital for continued care and has remained there with a discharge order for a skilled nursing facility since September 2018.

105.  Mr. Leal, however, does not want to be admitted to a skilled nursing facility and wishes to be discharged home with Long-Term Care Waiver Services.  Discharge home without services or a caregiver in the home is against medical advice.

106.   Mr. Leal is at risk of unnecessary nursing facility entry.  He would be able to continue to live independently near his brother, children, and grandchildren with the assistance of the Long-Term Care Waiver services. Without those supports and services, Mr. Leal would have to enter a nursing facility.

*Jefferson Langlaise*

107.   Jefferson Langlaise requested Long-Term Care Waiver services in 2017, but was placed on the waitlist.

108.   Mr. Langlaise has a seizure disorder with generalized seizures that occur several times a week.  He also has co-occurring mental health conditions, dizziness, high blood pressure and high cholesterol.  He is unable to work due to his disabilities and needs assistance with walking, mobility, bathing, medication management, shopping, meal preparation and chores.

109.   Mr. Langlaise lives in an assisted living home, but his income is not enough to pay the cost.  His mother, his primary support, is paying the remainder of his rent and expenses.  She is nearing retirement age, has another adult child with a disability at home, and cannot continue to sustain the cost of paying the difference.

110.   Defendants assessed and ranked Mr. Langlaise at a Level 2 on the

28

waitlist.

111.   Defendants' ranking did not take into account the financial strain his mother is under to sustain the care he receives from the assisted living home.

112.   Mr. Langlaise is at risk of unnecessary nursing facility entry because his Social Security income is not enough to cover the cost of his assisted living home.  His mother is privately paying for the remainder of his rent, medications, incidental expenses, and transportation.  His mother is unsure how she will continue to support Mr. Langlaise.  She has limited years left to work herself plus cares for her older son with disabilities living with her.  Without the care that she pays for, Mr. Lainglaise would need to enter a nursing facility.

*Celia Lopez*

86.  Ms. Lopez requested Long-Term Care Waiver services in November 2014 but was placed on the waitlist

87.  Ms. Lopez lives with her granddaughter and her granddaughter's family.

88.  Ms. Lopez cannot perform necessary incontinence care, bathe herself, dress herself or eat without assistance.  She needs help with mobility and is at risk for serious injury from falls.  She needs assistance to access the community around her, and would enjoy doing so.

29

89.  Ms. Lopez's family is committed to helping her live at home with them. However, she needs help all day, every day, particularly because of her advanced dementia.  She cannot speak words anymore.

90.  Ms. Lopez is helped each day and each night by caregivers paid for by her grandchildren.  However, this arrangement is not sustainable financially. Moreover, because of the cost, Ms. Lopez does not have sufficient services to access the world outside of her granddaughter's home.

91.   Defendants recently assessed Ms. Lopez and ranked her a Level 1 on the waitlist.

92.   The Defendants' ranking does not reflect Ms. Lopez's dementia and need for supervision to prevent wandering.  Nor does the ranking take into consideration the financial strain the cost of her care puts on her grandchildren. They cannot sustain the continued cost and, without the care they pay for, Ms. Lopez would have to enter a nursing facility.

*Geraldine Davenport*

93.   Ms. Davenport requested Long-Term Care Waiver services in March 2013 but was put on the waitlist.

94.   At that time, Ms. Davenport was living with her daughter who sought services for her mother because her mother had dementia and did not have much

30

money

95.    While waiting for services and living with her daughter, Ms. Davenport was without a caretaker while her daughter was at work.   Her confusion led to episodes of risky behavior, including taking all her medications at once, putting paper plates in the toaster oven, forgetting if she ate food, and eating multiple lunches.

96.    In late December 2017, Ms. Davenport experienced severe back pain—she had fractured her eleventh vertebrae.   Although she had a large bruise on her back, she did not remember falling.   She was hospitalized and then released to a rehabilitation facility.   She could not return home because her daughter worked during the day and there was no caretaker or services to provide the support Ms. Davenport required.    After rehabilitation, Ms. Davenport moved to an assisted living home in January 2018.

97.    Ms. Davenport meets the qualifications for the Long-Term Care Waiver.  She needs assistance with bathing, transferring, as well as walking and mobility.   She cannot manage her own money, prepare meals, shop, or do chores.   She cannot use the telephone, manage her medications, and use transportation without assistance.

98.    Ms. Davenport experiences bouts of depression and requires the

relaxed and quiet environment that she now has at her assisted living home.  She

has visited nursing facilities in the past and found the setting to be depressing.

99.    In January 2018, the Defendants ranked Ms. Davenport at Level 2 on

the waitlist.

100.   Her risk assessment score did not take into consideration her dementia

or memory loss, the fact that she was in a rehabilitation facility, or her history

of falls.

101.   Ms. Davenport wants to remain in the community.  She is at risk of

unnecessary nursing facility entry because she cannot afford the cost of the

assisted living home where she lives.  Without the services provided by the

assisted living home, Ms. Davenport would have to enter a nursing facility.


<u>CLAIM FOR RELIEF</u>

AMERICANS WITH DISABILITIES ACT

102.   Paragraphs 1 through 101 are incorporated by reference.

103.   Title II of the Americans with Disabilities Act provides that, "no

qualified individual with a disability shall, by reason of disability, be excluded

from participation in or be denied the benefits of the services, programs, or

activities of a public entity, or be subjected to discrimination by any such

32

entity." 42 U.S.C. § 12132.

104.  Each Named Plaintiff and proposed class member is a "qualified individual with a disability" within the meaning of the ADA in that they: (1) have a physical impairment that substantially limits one or more major life activities; and (2) meet the essential eligibility requirements for long-term care under Florida's Medicaid program.

105.  Defendants are public agency directors responsible for operation of a public entity, pursuant to 42 U.S.C. §§ 12131(1)(A) & (B).

106.  Title II of the ADA requires that public entities "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." *See* 28 C.F.R. § 35.130(d).

107.  Defendants violate the integration mandate of the ADA by failing to provide needed home and community based services to Named Plaintiffs and proposed class members, placing them at risk of unnecessary institutionalization or segregation.

108.  The ADA further prohibits a state from utilizing, "criteria or other methods of administration [t]hat have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability." *See* 28 C.F.R. § 35.130(b)(3)(i).  This includes methods of administration that,

"have the purpose or effect of defeating or substantially impairing accomplishment of objectives of the public entity's program with respect to individuals with disabilities." *Id.* § 35.130(b)(3)(ii).

109.   Defendants' criteria and methods of administering the Long-Term Care Waiver subject Named Plaintiffs and proposed class members to discrimination by: (1) using a system of assessment and prioritization that underestimates risk of institutionalization and places individuals at risk of unnecessary institutionalization; and (2) funding Medicaid Long-Term Care services with a bias toward institutional care.

110.   Defendants' unlawful discrimination against Named Plaintiffs and proposed class members violates Title II of the ADA.

## REQUEST FOR RELIEF

WHEREFORE, Named Plaintiffs and proposed class members respectfully request that this Court:

a.   Certify this action as a class action and appoint individual Named Plaintiffs as class representatives;

b.    Declare that Defendants' failure to provide Named Plaintiffs and proposed class members with needed home and community based services violates Title II of the ADA;

c.    Enter a permanent injunction requiring Defendants to comply with the ADA, to include at a minimum:

i.    the provision of Medicaid-funded home and community based services required by Named Plaintiffs and the proposed class members to avoid or prevent unnecessary institutionalization and to avoid segregation;

ii.    notification to Named Plaintiffs and proposed class members of the availability of home and community-based alternatives to nursing facility or other institutional care and how to access those alternatives; and

iii.   development of a valid and reliable assessment tool for risk of nursing facility.

d.   Require Defendants to publicly report on a quarterly basis on the progress of compliance;

e.  Retain jurisdiction over this case until Defendants have come into compliance with the ADA as applied to Named Plaintiffs and proposed class members;

f.  Award Plaintiffs their reasonable attorneys' fees, litigation expenses, and costs; and

g.  Grant such other relief as this Court deems just and proper.

Dated:  December 12, 2018     Respectfully submitted,


/s/ Amanda Heystek
AMANDA HEYSTEK, Fla. Bar No. 285020
amandah@disabilityrightsflorida.org
Disability Rights Florida
1000 N. Ashley Dr. Ste. 640
Tampa, FL 33602
(850) 488-9071

JODI SIEGEL, Fla. Bar No. 511617
jodi.siegel@southernlegal.org
Southern Legal Counsel, Inc.
1229 NW 12th Avenue
Gainesville, FL 32601
(352) 271-8890

NANCY E. WRIGHT, Fla. Bar No. 309419
newright.law@gmail.com
Law Office of Nancy E. Wright
3231 NW 47th Place
Gainesville, FL 32605

(352) 871-8255

REGAN BAILEY, *pro hac vice pending*
rbailey@justiceinaging.org
CAROL A. WONG, *pro hac vice pending*
cwong@justiceinaging.org
JUSTICE IN AGING
1444 Eye Street, NW Suite 1100
Washington, D.C.  20005
(202) 683-1990

ERIC CARLSON, *pro hac vice pending*
ecarlson@justiceinaging.org
JUSTICE IN AGING
3660 Wilshire Blvd., Suite 718
Los Angeles, CA  90010
(213) 674-2813

JOHN J. SULLIVAN, *pro hac vice pending*
jsullivan@cozen.com
DAVID H. REICHENBERG, *pro hac vice pending*
dreichenberg@cozen.com
COZEN O'CONNOR
45 Broadway Suite 1600
New York, NY 10006
(212) 453-3729

ASHLEY GOMEZ-RODON, Fla. Bar No. 1010237
agomez-rodon@cozen.com
COZEN O'CONNOR
200 South Biscayne Boulevard, Suite 3000
Miami, FL 33131
(786) 871-3996

**ATTORNEYS FOR PLAINTIFFS**